# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50940

| | | |
|---|---|---|
| In Re: Verified Petition for Writs of Certiorari and Mandamus. | ) | |
| ----------------------------------------------- | ) | |
| IDAHOANS FOR OPEN PRIMARIES and RECLAIM IDAHO, | ) | Boise, August 2023 Term |
| | ) | |
| Petitioners, | ) | Opinion filed: August 16, 2023 |
| | ) | |
| v. | ) | Melanie Gagnepain, Clerk |
| | ) | |
| RAÚL R. LABRADOR, in his official capacity as the Idaho Attorney General, and PHIL MCGRANE, in his official capacity as the Idaho Secretary of State, | ) ) ) ) | SUBSTITUTE OPINION, THE OPINION DATED AUGUST 10, 2023, IS WITHDRAWN |
| | ) | |
| Respondents. | ) | |
| | ) | |

Original proceeding in the Idaho Supreme Court seeking writs of certiorari and mandamus.

Petitioners' Verified Petition for a Writ of Certiorari is <u>granted</u> and the Verified Petition for a Writ of Mandamus is <u>denied</u>.

Ferguson Durham, PLLC, Boise, for Petitioners. Deborah A. Ferguson argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondents.
Theodore J. Wold, Solicitor General, argued.

---

ZAHN, Justice.

Petitioners Idahoans for Open Primaries and Reclaim Idaho filed an original action, asserting that the Idaho Attorney General's short and general ballot titles for "The Idaho Open Primaries Act" fail to comply with Idaho Code section 34-1809(2)(d) and (e). Petitioners request a writ of certiorari, asking this Court to declare the ballot titles deficient, certify Petitioners' proposed short and general ballot titles to the Idaho Secretary of State, or in the alternative, retain jurisdiction of this matter and order the Attorney General to immediately prepare ballot titles

consistent with Petitioners' proposed titles and submit them to this Court for review. Petitioners also request that this Court issue a writ of mandamus compelling the Secretary of State to extend the deadline for Petitioners to obtain signatures to qualify the initiative for placement on the 2024 general election ballot.

We grant the Petition for Writ of Certiorari and hold that the short and general titles fail to substantially comply with Idaho Code section 34-1809. We order the Attorney General to provide revised, substantially compliant short and general ballot titles to this Court by no later than 4 p.m. Mountain Daylight Time ("MDT") on Friday, August 11, 2023. We will retain jurisdiction of this matter in the interim. Petitioners' request for a writ of mandamus to extend the deadline for collecting signatures is denied.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Idahoans for Open Primaries is a coalition of member organizations, which includes Reclaim Idaho, the Idaho Task Force of Veterans for Political Innovation, North Idaho Women, and the Hope Coalition. Idahoans for Open Primaries and Reclaim Idaho are working to qualify a voter initiative (the "Initiative") for the 2024 general election ballot.

The Initiative seeks to replace Idaho's closed party primary system with a "top four primary election," which the Initiative defines as:

> [A]n election, other than a judicial nominating election, held for the purpose of determining the candidates who will appear on the general election ballot. In top four primary elections, all candidates will appear on the same ballot regardless of party affiliation, and all qualified electors may participate regardless of party affiliation. Top four primary elections do not determine any party's nominee and candidates who advance from a top four primary election to a general election are not considered nominees of any political party. Top four primary elections shall be held on the same day as primary elections.

The top four primary would be used in Idaho's primary elections for the United States Senate, the United States House of Representatives, the State Legislature, elective state offices, and county elective offices. Candidates could choose to list their party affiliation on both the primary and general election ballots, but would not be required to do so.

The Initiative would also implement a "ranked choice" or "instant runoff" voting system for the general election. Under this system, voters could rank candidates on the ballot in order of preference or choose to vote for a single candidate. After voting concluded, votes would be tabulated in rounds. In the first round, each ballot's first-choice candidates would be tabulated, and

2

in the event no candidate received a majority of votes cast, the candidate receiving the fewest first-choice votes would be eliminated. The remaining candidates are designated "active candidates."

In a round of tabulation, a ballot counts as a vote for its highest-ranked active candidate. In each successive round of tabulation, so long as the ballot contains rankings for other active candidates, a vote for an eliminated candidate would be transferred to the ballot's next highest-ranking active candidate. If all of the candidates ranked on that ballot are eliminated, the ballot would become "inactive" and would no longer be counted. The rounds would proceed until only two candidates remained, at which point the candidate who received the most votes would be declared the winner.

On May 2, 2023, Ashley Prince, a member and employee of Reclaim Idaho, sent a copy of an initiative petition for "The Idaho Open Primaries Act" to Idaho Secretary of State Phil McGrane. Prince sent a cover letter with the petition, at the top of which was printed "Idahoans for Open Primaries." Prince wrote that, "Idahoans for Open Primaries, a coalition of community groups and civic organizations, is formally filing the attached proposed initiative to be referred to as 'The Idaho Open Primaries Act' for Certificate of Review."

When Prince submitted this initiative petition ("the May initiative petition") to the Secretary of State, Idaho law triggered a series of events, which must occur within specified timeframes:

- The Secretary of State files the initiative petition in his office and immediately transmits the initiative petition to the Attorney General for issuance of a certificate of review under Idaho Code section 34-1809. I.C. §§ 34-1804(1), 34-1809(1).

- The Attorney General then has twenty working days to review the initiative petition "for matters of substantive import and shall recommend to the petitioner such revision or alteration of the measure as may be deemed necessary and appropriate." I.C. § 34-1809(1)(a). The Attorney General issues his certificate of review to the Secretary of State, which is made available to the public by his office. I.C. § 34-1809(1)(c).

- The Attorney General's recommendations are advisory only and the petitioner is free to accept or reject them. I.C. § 34-1809(1)(b).

- If the petitioner wishes to proceed with the initiative, she has fifteen working days to file the initiative with the Secretary of State to be issued ballot titles. I.C. § 34-1809(2). Upon receipt, the Secretary of State submits the initiative to the Attorney General. *Id.*

- The Attorney General then has ten working days to prepare "short" and "general" ballot titles and submit the titles to the Secretary of State. I.C. § 34-1809(2)(a), (d). The Secretary of State furnishes the initiative and its ballot titles to the petitioner. I.C. § 34-1809(2)(b).

- A person desiring to challenge the ballot titles may, within twenty days of the issuance of the titles, appeal to this Court by petition, praying for different titles and setting forth the reason why the titles are insufficient or unfair. I.C. § 34-1809(3), (3)(a).

- "The supreme court shall thereupon examine said measure, hear argument, and in its decision thereon certify to the secretary of state a ballot title and a short title for the measure in accord with the intent of this section." I.C. § 34-1809(3)(c).

Upon receiving the May initiative petition, the Secretary of State filed it in his office and transmitted it to Idaho's Attorney General, Raúl R. Labrador, for his review. The same day, the Attorney General posted a statement on Twitter opposing the May initiative petition by stating, "[l]et's defeat these bad ideas coming from liberal outside groups." Theodore J. Wold, an employee of the Attorney General designated as Idaho's Solicitor General, then posted a similar statement on Twitter: "State AGs are the strongest line of defense against the Left's national campaign to force ranked choice voting on our elections. Leave this failed idea in NYC and Oakland."

On May 31, the Attorney General issued his certificate of review for the May initiative petition. The Attorney General opined that the initiative contained multiple defects that rendered it unconstitutional. Pertinent here, the Attorney General wrote that the initiative's use of the term "open primary" was misleading because the initiative would not create an open primary. He suggested the term "blanket primary" was a more accurate description of the primary system proposed in the initiative. The Attorney General also wrote that the initiative would *require* voters to rank each candidate.

Following the Attorney General's issuance of the certificate of review, Prince revised the initiative petition and sent it to the Secretary of State for issuance of ballot titles. Relevant to this action, Prince removed the phrase "open primary" and substituted "top four primary" in its place. Prince also changed language to clarify that voters would not be required to rank each candidate in the general election.

Prince included a cover letter, which was again written on letterhead identifying Idahoans for Open Primaries and again included an email address associated with the group. In the letter, Prince explained that the term "blanket primary" did not accurately describe the Initiative's proposed primary system. Instead, Prince suggested "top four primary" or "top four open primary" as appropriate terms.

4

On June 30, the Attorney General hand delivered "short" and "general" ballot titles to the Secretary of State. With the ballot titles, the Attorney General included a cover letter, which stated that, although he furnished ballot titles as required by Idaho law, he believed the Initiative violated Idaho's constitution for the reasons identified in his Certificate of Review and was therefore ineligible to be placed on the ballot. The Attorney General stated his intention to litigate the issue if the sponsors of the Initiative sought to have it enrolled on the ballot. The Secretary of State then immediately transmitted the titles to Petitioners.

On July 10, Petitioners filed a Verified Petition for Writs of Certiorari and Mandamus with this Court, accompanied by a brief in support and the Declaration of Luke Mayville, the Executive Director of Reclaim Idaho. Petitioners alleged that the Attorney General's short ballot title fails to comply with state law because it is not distinctive, does not reflect how the measure is "commonly referred to or spoken of," is inaccurate, is not impartial, and is an argument against the Initiative. Petitioners contend the general title suffers from similar defects because it is neither fair nor impartial, creates prejudice against the Initiative, contains false statements, and is an argument against the Initiative.

Petitioners moved this Court to expedite briefing and hearing in this matter under Idaho Rule of Appellate Procedure 5 because the deficient ballot titles have delayed the signature-gathering process and further delay may doom the possibility of placing the Initiative on the ballot altogether. This Court granted Petitioners' motion to expedite and issued orders setting an expedited briefing schedule. We heard oral argument from the parties on August 7, 2023.

## II. STANDARD OF REVIEW

"The Supreme Court shall . . . have original jurisdiction to issue writs of mandamus, certiorari, prohibition, and habeas corpus, and all writs necessary or proper to the complete exercise of its appellate jurisdiction." Idaho Const. art. V, § 9. "This original jurisdiction is limited only by the separation of powers provisions contained in Article II, [s]ection 1 of the Idaho Constitution and this Court's own rules." *Ybarra v. Legislature by Bedke*, 166 Idaho 902, 906, 466 P.3d 421, 425 (2020) (citing *Mead v. Arnell*, 117 Idaho 660, 663, 791 P.2d 410, 413 (1990)). "Once this Court asserts its original jurisdiction, 'it may issue writs of mandamus and/or prohibition.'" *Id.* (quoting *Mead*, 117 Idaho at 663–64, 791 P.2d at 413–14). "This Court has repeatedly held that mandamus is not a writ of right and the allowance or refusal to issue a writ of mandate is

discretionary." *Coeur d'Alene Tribe v. Denney*, 161 Idaho 508, 512, 387 P.3d 761, 765 (2015) (citations omitted).

### III.    ANALYSIS

**A.  Petitioners have properly invoked this Court's original jurisdiction.**

We must initially determine whether Petitioners have properly invoked this Court's original jurisdiction. *See Reclaim Idaho v. Denney*, 169 Idaho 406, 417–18, 497 P.3d 160, 171–72 (2021). "A writ of review may be granted by any court except the magistrates division of the district court, when an inferior tribunal, board or officer exercising judicial functions, has exceeded the jurisdiction of such tribunal, board or officer, and there is no appeal, nor, in the judgment of the court, any plain, speedy and adequate remedy." I.C. § 7-202.

Previously, in *In re The Petition of Idaho State Federation of Labor (AFL)*, this Court held that reviewing ballot titles falls within the scope of our original jurisdiction. 75 Idaho 367, 374, 272 P.2d 707, 711 (1954) ("*AFL*"). There, we stated that our role was "to declare the legal requirements and standards by which the short title is to be constructed and to determine whether or not the title as submitted by the Attorney General complies therewith." *Id.*

We hold that the circumstances here are sufficient to invoke this Court's original jurisdiction. *See Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766. Although Petitioners do not specifically allege a constitutional violation in their brief in support of their Verified Petition, they do allege that the "issue is one of statewide importance and arises from the people's fundamental constitutional right to initiate or repeal legislation, as set forth in Article III, [section] 1 of the Idaho Constitution." Petitioners also correctly note that they cannot begin collecting signatures for the Initiative until the Secretary of State certifies a valid short ballot title. *See Buchin v. Lance* (*In re Writ of Prohibition Entitled "Ballot Title Challenge Oral Argument Requested"*), 128 Idaho 266, 273, 912 P.2d 634, 641 (1995) (holding that, "any signature collected by the circulation of a petition with . . . invalid titles cannot be valid"). Petitioners allege that, in the absence of valid, certified ballot titles, they cannot begin obtaining signatures to meet the signature requirement and that they have no other adequate remedy at law. This is sufficient to invoke this Court's original jurisdiction.

**B.  Petitioners have standing to bring this action.**

The Attorney General initially argues that we should dismiss this action because Petitioners lack standing. "Concepts of justiciability, including standing, identify appropriate or suitable

6

occasions for adjudication by a court." *Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766 (citation omitted). "Standing focuses directly on whether a particular interest or injury is adequate to invoke the protection of judicial decision." *Id.* (citation omitted). Thus, standing "requires a showing of a 'distinct palpable injury' and 'fairly traceable causal connection between the claimed injury and the challenged conduct.'" *Id.* (citation omitted). A "palpable injury" is "an injury that is easily perceptible, manifest, or readily visible." *Id.* (citation omitted). "Moreover, the injury cannot be one suffered alike by all citizens in the jurisdiction." *Id.* (citation omitted).

An entity can have standing in one of two ways. *See Nampa Educ. Ass'n v. Nampa Sch. Dist. No. 131*, 158 Idaho 87, 90, 343 P.3d 1094, 1097 (2015). First, the entity can have standing in its own right by showing a "distinct palpable injury" and a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766 (citation omitted). Second, an entity may assert "associational" standing on behalf of its members even when the entity does not have standing in its own right. *See Citizens Against Linscott/Interstate Asphalt Plant v. Bonner Cnty. Bd. of Comm'rs*, 168 Idaho 705, 713, 486 P.3d 515, 523 (2021) (citing *Selkirk-Priest Basin Ass'n v. State ex rel. Andrus*, 127 Idaho 239, 241, 899 P.2d 949, 951 (1995)).

The Attorney General addresses only the first type of standing and argues that Petitioners cannot demonstrate a cognizable injury sufficient to confer standing in their own right. He also argues that Petitioners lack the legal capacity to sue. Petitioners respond that they have associational standing.

We employ a three-part test derived from the United States Supreme Court's decision in *Warth v. Seldin*, 422 U.S. 490 (1975), to determine whether an entity has associational standing. *See id.* An association has standing by virtue of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Id.* (quoting *In re Jerome Cnty. Bd. of Comm'rs*, 153 Idaho 298, 310, 281 P.3d 1076, 1088 (2012)). "A key inquiry under this test is 'whether the association has alleged that at least one of its members face injury and could meet the requirements of standing on an individual basis.'" *Id.* (quoting *In re Jerome Cnty. Bd. of Comm'rs*, 153 Idaho at 308, 281 P.3d at 1086).

7

We hold that Petitioners have associational standing to bring this action. Idahoans for Open Primaries is a coalition of member organizations including Reclaim Idaho, the Idaho Task Force of Veterans for Political Innovation, North Idaho Women, and the Hope Coalition. Because Reclaim Idaho is a member of Idahoans for Open Primaries, if Reclaim Idaho establishes that it has standing to sue on behalf of its members, then Idahoans for Open Primaries would similarly have standing. *See N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9–10 (1988) (holding that an association had standing when its member organization had standing on behalf of its individual members). Thus, we focus our associational standing analysis on Reclaim Idaho.

First, Reclaim Idaho has alleged that at least one of its members faces injury and could meet the requirements of standing on an individual basis. The Verified Petition alleges that Reclaim Idaho is an Idaho-based political action committee, registered with the Secretary of State. Petitioners submitted the Declaration of Ashley Prince with their reply brief. Prince asserts that she is one of more than one thousand members of Reclaim Idaho who volunteer their time to participate in campaigns. She has also been an employee of Reclaim Idaho since 2021, where she works as a campaign manager. Prince declares that Reclaim Idaho is actively pursuing the Initiative to qualify it for the 2024 general election ballot, and that she has served as the "campaign manager" for the Idahoans for Open Primaries Initiative campaign while continuing to fulfill her role as an employee of Reclaim Idaho.

Prince alleges that the Attorney General's ballot titles have injured Reclaim Idaho's members because (1) the ballot titles are prejudicial and inaccurate, which would make obtaining signatures much more difficult; and (2) members are delayed in gathering signatures for the Initiative until the Attorney General provides ballot titles that comply with Idaho law, which in turn has reduced the timeframe for obtaining signatures, thereby reducing the chance it will qualify for the ballot. Petitioners seek statutorily compliant ballot titles that would remedy their alleged harm.

Prince has thus established that, as the campaign manager for the Initiative and a member of Reclaim Idaho, she has suffered an injury in fact due to her inability to gather signatures for the Initiative, that her inability to gather signatures is the result of the Attorney General's alleged failure to draft short and general ballot titles that comply with section 34-1809, and that a decision from this Court deeming the titles deficient and directing the preparation of compliant ballot titles

would accurately acquaint voters with the Initiative and allow her to collect signatures. This evidence is sufficient to meet the first element of the associational standing test.

Second, the interests Reclaim Idaho seeks to protect in this action are germane to its purpose. Petitioners allege "Reclaim Idaho is a grassroots organization designed to protect and improve the lives of working Idahoans" and that it "advocates for policies and initiatives that improve the electoral system, strengthen public schools, protect citizen-initiative rights, and extend healthcare to working families." Reclaim Idaho has asserted an interest in working to qualify the Initiative for the 2024 general election ballot. Obtaining sufficient ballot titles is, therefore, germane to its alleged purpose. This is sufficient to meet the second element of the associational standing test.

Third, our review of the ballot titles does not require individual participation from Reclaim Idaho's members. "When an association seeks some form of prospective relief, such as a declaration or an injunction, its benefits will likely be shared by the association's members without any need for individualized findings of injury that would require the direct participation of its members as named parties." *Beach Lateral Water Users Ass'n v. Harrison*, 142 Idaho 600, 604, 130 P.3d 1138, 1142 (2006). Here, Reclaim Idaho requests prospective relief in the form of new ballot titles, which would not require direct participation from members or require individualized findings of injury.

We hold that Reclaim Idaho has established all three elements and therefore has associational standing to sue on behalf of its members. Given that Reclaim Idaho is a member of Idahoans for Open Primaries, we conclude that Idahoans for Open Primaries also has associational standing. *See N.Y. State Club Ass'n*, 487 U.S. at 9.

At oral argument, the Solicitor General took issue with the fact that Petitioners first addressed the issue of associational standing in their reply brief and suggested the Attorney General should be permitted additional time to brief the issue of associational standing. However, Petitioners addressed the issue of associational standing in their reply because the Attorney General alleged in his response that they lacked standing to bring this action. In his response brief, the Attorney General chose to only address one test this Court employs for standing. For at least thirty-four years, this Court has also recognized a second test to satisfy standing—associational standing. *See Bear Lake Educ. Ass'n, by and through Belnap v. Bd. of Trs. of Bear Lake Sch. Dist. No. 33*, 116 Idaho 443, 448–49, 776 P.2d 452, 457–58 (1989). The law is well-established in this

regard, and we hold that the evidence in the record establishes that Petitioners satisfy the requirements for associational standing. We therefore see no benefit to reopening the briefing to permit additional argument on this issue, especially considering that time is of the essence in resolving this action.

The Attorney General also contends that Idahoans for Open Primaries and Reclaim Idaho lack the legal capacity to sue in Idaho's courts. The Attorney General asserts Reclaim Idaho is transacting business under an assumed business name without filing a certificate of assumed business name. As a result, the Attorney General asserts that Reclaim Idaho is barred from filing this original action. *See* I.C. § 30-21-810(a).

Petitioners assert in their Verified Petition that Reclaim Idaho is an Idaho-based political committee, registered with the Secretary of State. Idaho law subjects political committees to potential civil liability, which demonstrates their capacity to be sued. *See* I.C. §§ 67-6602(19) and (20); 67-6625(1). If they can be sued, it follows that political committees may also sue under Idaho law.

Further, Idaho's Assumed Business Name Act defines "assumed business name" as "[a]ny name other than the true name of any filing entity. . ., under which name the entity holds itself out for the transaction of business in the state of Idaho[.]" I.C. § 30-21-803(1)(A). The Attorney General has produced no evidence that Reclaim Idaho is transacting business under an assumed name—i.e., a name other than its true name registered with the Secretary of State's Office. As a result, the Attorney General has failed to establish that Idaho law required Reclaim Idaho to file a certificate of assumed business name. Thus, we conclude that Reclaim Idaho is legally entitled to file this action.

Idahoans for Open Primaries also has the legal capacity to sue under Idaho law. Petitioners assert Idahoans for Open Primaries is an unincorporated nonprofit association under section 30-27-102(a)(5). An "unincorporated nonprofit association" is "an unincorporated organization consisting of two (2) or more members joined under an agreement that is oral, in a record, or implied from conduct for one (1) or more common, nonprofit purposes." I.C. § 30-27-102(a)(5). Idaho Code section 30-27-109(a) provides "unincorporated nonprofit associations" with the legal capacity to sue or be sued. The Attorney General has not provided evidence that Idahoans for Open Primaries has a different entity status or is otherwise incapable of commencing this action.

Accordingly, we conclude that Idahoans for Open Primaries is also legally entitled to file this action.

Based on the foregoing, we hold that Petitioners have standing and the legal capacity to maintain this action. We now turn to the merits of their claims.

**C. The Attorney General's ballot titles do not substantially comply with Idaho Code section 34-1809(2)(d) and (e).**

a. Legal Standard.

Preliminarily, the Attorney General argues that we should apply an abuse of discretion standard to review the ballot titles in this case. He argues that our precedents have already recognized the discretionary nature of drafting ballot titles, so it follows that we should apply our established abuse of discretion standard. The Attorney General argues reviewing ballot titles under an abuse of discretion standard is the majority rule across other jurisdictions.

Petitioners argue an abuse of discretion standard is inappropriate and that we should instead adopt a de novo standard. Petitioners contend that our prior decisions reviewing ballot titles have not employed an abuse of discretion standard. Because the Verified Petition asks us to determine whether the ballot titles comply with Idaho Code section 34-1809, they argue the inquiry is really a question of law, which is subject to de novo review.

Our caselaw reviewing ballot titles has not expressly articulated the legal standard we apply when reviewing ballot titles. However, we have long recognized that "it is not the Court's role to find another way or the best way to draft a [ballot] title, but rather to examine the Attorney General's language and ask whether it expresses the 'purpose of the measure' without being argumentative or prejudicial." *Buchin*, 128 Idaho at 270, 912 P.2d at 638 (citation omitted). This language indicates we are only reviewing the titles to determine whether they comply with the law.

We decline the Attorney General's invitation to apply an abuse of discretion framework in this context. When this Court reviews a decision for an alleged abuse of discretion, we ask whether the decisionmaker: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018) (citation omitted). When reviewing ballot titles, we are not considering a decision that includes the type of reasoning and analysis found in judicial or similar administrative decisions. While this Court has referenced the Attorney General's role in drafting ballot titles as quasi-judicial, there is no presentation of evidence or

11

process through which the Attorney General documents the reasons he chose to draft the ballot titles as he did. Instead, we are called upon to review the ballot titles themselves. The lack of a record makes it exceedingly difficult, if not impossible, to apply the four-part abuse of discretion test in this instance.

We also decline Petitioners' invitation to apply a de novo standard to review the titles. The language from *Buchin* establishes that we are not reviewing the ballot titles to determine whether they are the best descriptions of the Initiative. Rather, we review the titles to determine whether they fairly express the "purpose of the measure." *Buchin*, 128 Idaho at 270, 912 P.2d at 638.

Accordingly, we hold that the "substantial compliance" standard best describes our inquiry when reviewing ballot titles. This Court has applied a substantial compliance standard of review in similar situations where the critical inquiry is whether a party has met statutory requirements. *See, e.g.*, *Sims v. ACI Nw., Inc.*, 157 Idaho 906, 910, 342 P.3d 618, 622 (2015) (requiring substantial compliance with mechanic's and materialman's lien statutes); *Weaver v. Vill. of Bancroft*, 92 Idaho 189, 192, 439 P.2d 697, 700 (1968) (requiring substantial compliance with notice provisions applicable to governmental subdivisions). Additionally, at least one other sister state applies this standard under similar circumstances. *See Ross v. Bennett*, 265 P.3d 356, 358–59 (Ariz. 2011) (holding that recall petitions must substantially comply with state constitutional and statutory framework). Having articulated the legal standard to be employed, we now turn to whether the Attorney General's ballot titles substantially complied with the requirements of section 34-1809.

b. <u>The Attorney General's short title does not substantially comply with section 34-1809.</u>

Idaho Code section 34-1809(2)(d) requires the Attorney General to provide a short title not exceeding twenty words for a proposed initiative:

> (d) The ballot title shall contain:
>
>> (i) Distinctive short title not exceeding twenty (20) words by which the measure is commonly referred to or spoken of and which shall be printed in the foot margin of each signature sheet of the petition.
>
> . . . .
>
> (e) In making the ballot title, the attorney general shall, to the best of his ability, give a true and impartial statement of the purpose of the measure and in such language that the ballot title shall not be intentionally an argument or likely to create prejudice either for or against the measure.

I.C. § 34-1809(2)(d)(i), (2)(e).

The Attorney General's short title for the Initiative states:

Measure to (1) replace voter selection of party nominees with nonparty blanket primary; (2) require ranked-choice voting for general elections.

Petitioners take issue with several aspects of the short title. Specifically they contend: (1) the use of the term "nonparty blanket primary" fails to incorporate language by which the measure is commonly referred to or spoken of, is not distinctive, and is prejudicial; (2) that the phrase "require ranked choice voting" is prejudicial and the term "ranked choice voting" is not distinctive; (3) that the phrases "replace voter selection of party nominees" and "require ranked choice voting" are prejudicial; and (4) that the division of the short title into two numbered sections is an argument against the Initiative. We address each of Petitioners' challenges in turn.

i. <u>The term "nonparty blanket primary" is not language by which the Initiative or the system it proposes is commonly referred to or spoken of.</u>

Petitioners first take issue with the short title's use of "nonparty blanket primary" to describe the primary system proposed by the Initiative. Petitioners argue that section 34-1809(2)(d)(i) requires the Attorney General to describe the Initiative as it is commonly referred to or spoken of. Petitioners contend that the terms "nonparty blanket primary" and "blanket primary" are absent from common usage. They further argue that the Initiative is titled and commonly referred to as the "Idaho Open Primaries Act" and therefore, the short title should use the term "open primary" rather than "nonparty blanket primary." To support their argument, Petitioners point to news media sources, the Secretary of State's website, and similar initiatives in other states.

The Attorney General argues that the "commonly referred to or spoken of" language in section 34-1809(2)(d)(i) is not a substantive requirement of the statute. Instead, he asserts that section 34-1809(2)(d) and (e) require him to draft a short title that meets certain substantive requirements and that the Initiative *will be* commonly referred to by his chosen short title.

Before addressing the merits of Petitioners' argument on this point, we must first interpret the language of section 34-1809 to determine whether the "commonly referred to or spoken of" language in the statute imposes an additional requirement for the short ballot title or is simply an indication that an initiative will become commonly known by the short ballot title assigned to it. "The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act." *Chester v. Wild Idaho Adventures RV Park, LLC*, 171 Idaho 212, 223, 519 P.3d 1152, 1163 (2022) (quoting *Nelson v. Evans*, 166 Idaho 815, 820, 464 P.3d 301, 306 (2020)). Statutory interpretation begins with the literal language of the statute giving the words their plain, usual, and

ordinary meaning. *See Access Behav. Health v. Dep't of Health & Welfare*, 170 Idaho 874, 881, 517 P.3d 803, 810 (2022) (citation omitted). "If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *Chester*, 171 Idaho at 223, 519 P.3d at 1163 (quoting *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011)). "Statutory language is ambiguous where reasonable minds might differ or be uncertain as to its meaning." *Nordgaarden v. Kiebert*, 171 Idaho 883, 890, 527 P.3d 486, 493 (2023) (alteration omitted).

The language at issue is found in section 34-1809(2)(d)(i), which states:

(d) The ballot title shall contain:

(i) Distinctive short title not exceeding twenty (20) words *by which the measure is commonly referred to or spoken of* and which shall be printed in the foot margin of each signature sheet of the petition.

(Emphasis added.)

We begin by examining the plain language of the statute. Section 34-1809(2)(d)(i) states that the short ballot title shall contain words "by which the measure is commonly referred to or spoken of." The use of the present-tense verb "is" in combination with the phrase "commonly referred to or spoken of" indicates the Attorney General must determine how an initiative "is" commonly referred to or spoken of and incorporate that language into the short title. The Attorney General's interpretation would require us to read words into the statute that are not there. He essentially contends we should replace the word "is" with "will be" so it reads as: *by which the measure ~~is~~ will be commonly referred to or spoken of.*" We will not add to or alter the language of a statute that the Legislature has drafted. *Saint Alphonsus Reg'l Med. Ctr. v. Gooding County*, 159 Idaho 84, 89, 356 P.3d 377, 382 (2015) (citing a string of cases). The plain and unambiguous language of section 34-1809(2)(d)(i) requires the Attorney General to ascertain how an initiative is commonly referred to or spoken of and incorporate that language into the short title.

This task necessarily requires the Attorney General to determine how Idahoans commonly refer to and speak of a measure:

In constructing and phrasing the title, the Attorney General, not as an advocate or an adversary, must perforce analyze and appraise the proposed legislation, determine what it means and its distinctive characteristics *and endeavor to ascertain how it is commonly referred to or spoken of.* In thus drafting and making an impartial, but comprehensive, short title, he is exercising a quasi judicial [sic] function.

14

*AFL*, 75 Idaho at 374, 272 P.2d at 710–11 (emphasis added). In the event the Attorney General is unable to identify common language used to refer to the measure, he may look outside the state to determine whether common language can be found in other states. Ascertaining how *the public* refers to a measure is important because the short title must "set forth the characteristics which distinguish [the] proposed measure and expeditiously and accurately acquaint the prospective signer with what he is sponsoring." *Id.* at 373, 272 P.2d at 710.

When ascertaining the language used to commonly refer to the measure, the Attorney General must remain mindful that the statute requires him to use language that is not "intentionally an argument or likely to create prejudice either for or against the measure." I.C. § 34-1809(2)(e). Finally, the short ballot title language must also meet the other statutory requirements—it must not exceed twenty words and it must be distinctive. I.C. § 34-1809(2)(d)(i).

Here, Petitioners argue that "nonparty blanket primary" is an obscure term that is absent from common parlance within Idaho. In support of their position, Petitioners contend that the term "nonparty blanket primary" has not been used to describe the Initiative in any media reports covering the Initiative. The Attorney General has not submitted any evidence supporting his contention and we have failed to identify any.

However, the Attorney General contends that the term "blanket primary" has been used by the United States Supreme Court, in several policy journals, in a Washington State House of Representatives Bill Analysis, and in a Wikipedia entry. He asserts these authorities establish that it is a commonly used phrase to refer to the type of primary proposed by the Initiative. At oral argument, the Solicitor General also offered that he heard voters in Kootenai County use the term "blanket primary" in reference to the type of primary proposed by the Initiative. Petitioners dispute this contention, again relying on the absence of the term in Idaho media reports concerning the Initiative.

We conclude that the Attorney General has failed to establish that the term "nonparty blanket primary" is how the measure is commonly referred to or spoken of in Idaho. We have been unable to identify any court in the United States, including the United States Supreme Court, who has used the term in a published decision. It also does not appear that the term has been used elsewhere. Instead, it appears that the term is one of the Attorney General's own creation. While he explains that he added the word "nonparty" to differentiate the type of primary proposed here

from Idaho's existing nonpartisan primaries, that does not establish that the term "nonparty blanket primary" is in common usage.

The fact that the phrase "blanket primary" has been used in some circles also does not establish that the short title complies with the "commonly referred to" requirement. While the Attorney General's references establish that the term is used among some circles, such as scholars, lawyers, judges, and legislators, that does not establish that it is how the public commonly refers to the measure.

  ii.  <u>The term "nonparty blanket primary" is not distinctive.</u>

When assessing the sufficiency of a short title, "the fundamental inquiry is whether the short title . . . 'set[s] forth the characteristics which distinguish this proposed measure and expeditiously and accurately acquaint the prospective signer with what he or she is sponsoring.'" *Am. Civ. Liberties Union, Idaho Chapter v. Echohawk*, 124 Idaho 147, 151, 857 P.2d 626, 630 (1993) (alteration in original) (quoting *AFL*, 75 Idaho at 373, 272 P.2d at 710).

> "[D]istinctive" has been defined as: (1) referring primarily to that which marks or distinguishes one thing regarded in its relation to other things, (2) a mark or character indicating separation, (3) distinguishing from something diverse, or (4) serving or used to distinguish or discriminate. In drafting the short title, the Attorney General must, by force of circumstances, analyze and appraise the initiative in order to determine what the initiative means and its distinctive characteristics. The short title is to be comprehensive in nature.

*Buchin*, 128 Idaho at 269–70, 912 P.2d at 637–38 (citations omitted). Our prior decisions establish that, in order to be distinctive, a short title must communicate the chief characteristics of the initiative—including, when necessary, how the initiative proposes to alter current law. *See id* at 272, 912 P.2d at 640; *Echohawk*, 124 Idaho at 151, 857 P.2d at 630.

Thus, determining whether the short title is distinctive requires us to examine Idaho's existing election laws and compare them to what is proposed by the Initiative. Under the current primary system, candidates must be nominated at a party primary, where the victorious candidate then represents the party as its nominee in the general election. *See* I.C. § 34-703. This system produces one candidate from each qualifying party for the general election. *See* I.C. § 34-906.

The Initiative proposes replacing the current system with what it calls a "top four primary election." In a top four primary, "all candidates will appear on the same ballot regardless of party affiliation" and "all qualified electors may participate regardless party affiliation." "The four (4) candidates who receive the most votes shall advance to the general election[.]" Under the top four

primary system proposed, the top four candidates that advance could (1) all be from the same political party, (2) be from two or more political parties, or (3) all be unaffiliated.

Petitioners argue that, because the term "nonparty blanket primary" does not accurately describe the primary system proposed in the Initiative, it fails to "accurately acquaint the prospective signer with what he is sponsoring." The Attorney General argues that the term is accurate because the United States Supreme Court has used it to describe a system very similar to the one proposed by the Initiative.

In *California Democratic Party v. Jones*, the United States Supreme Court discussed the characteristics of a "partisan blanket primary" and a "nonpartisan blanket primary." 530 U.S. 567 (2000).

In a "partisan blanket primary," all primary election candidates are listed on a single ballot regardless of party affiliation and all voters, regardless of their party affiliation, are free to select a candidate from among the entire slate of candidates for each elected office. *Id.* at 570. The candidate from each party who received the most votes is selected as the party's nominee and proceeds to the general election as such. *Id.*

A "nonpartisan blanket primary" functions similarly to a partisan blanket primary, except it does not select one winner from each political party and the winning candidates are not the political party's nominees for the general election. *Id.* at 585–86. Instead, the top two (or more) vote-getters proceed to the general election regardless of party affiliation and the political party is free to choose whether to endorse any of the winning candidates. *Id.*

As noted, the Attorney General's short title uses the term "*nonparty* blanket primary." That term has not been used by the United States Supreme Court. Nor has it been used in any court decisions reported on Westlaw. As previously discussed, the Attorney General states in his response brief that he used the word "nonparty" in reference to "blanket primary" to avoid confusion between Idaho's nonpartisan and partisan primaries. Thus, it appears that the term is one of his own creation. For this reason alone, the term is not distinctive because voters have no existing definition to attach to a term that has never been used before. The short title is also defective because it fails to communicate to voters a key characteristic of the Initiative—how many candidates advance to the general election. Therefore, the short title fails to accurately acquaint the voter with what she is signing.

Petitioners further contend that the Initiative proposes an "open primary" and that any short title that fails to use that term will not be distinctive. Initially, we note that the revised Initiative that Prince filed with the Secretary of State is not called the "Idaho Open Primaries Act." Rather, the revised Initiative deleted that language. Further, it replaced references to "open primary election" with "top four primary election." However, even if the Initiative had retained its original language, we conclude that the term "open primary" also fails to adequately describe what the Initiative proposes.

An "open primary" is its own type of primary system within a party-run primary framework. *See State Primary Election Types*, Nat'l Conf. of State Legislatures, (Jun. 22, 2023), https://www.ncsl.org/elections-and-campaigns/state-primary-election-types. "In an open primary, voters may choose privately *in which primary to vote*." *Id.* (emphasis added). Thus, an open primary system exists where political parties hold independent party primaries to select party nominees and allow anyone, regardless of party affiliation, to vote in their primary. *Id.* The Initiative does not describe an "open primary" system because it does not propose retaining the separate, party-run primary system currently in place. *See* I.C. § 34-703; *see also Jones*, 530 U.S. at 576 n.6 ("An open primary differs from a blanket primary in that, although as in the blanket primary any person, regardless of party affiliation, may vote for a party's nominee, his choice is limited to that party's nominees for all offices." (emphasis omitted)).

Moreover, in a 2011 decision, the Idaho Federal District Court described Idaho's election statutes as establishing as an "open primary system":

> Idaho's primary election is an "open primary" system. Although any qualified voter may vote in the primary election without prior registration as a member of a political party, the voter must choose a single political party for which to cast his/her votes in the primary. Thus, a voter may cast his/her primary ballot for candidates of one, and only one, political party in the primary election.

*Idaho Republican Party v. Ysursa*, 765 F. Supp. 2d 1266, 1269 (D. Idaho 2011). The case arose after the Idaho Republican Party passed a "closed primary" rule that allowed only registered Republicans to vote in Idaho's Republican Party Primaries. *Id.* at 1270. Relying on the Supreme Court's decision in *Jones*, where the Court found a similar California primary system to be unconstitutional, the Idaho Republican Party sued the Secretary of State and argued that Idaho's open-primary statute violated its First Amendment right to associational freedom. *See id.* The Idaho Federal District Court agreed and declared Idaho's open primary system unconstitutional as

18

applied, to the extent it forced the Idaho Republican Party to have their nominees selected by those who refused to affiliate with the Party. *Id.* at 1276.

In the face of this evidence that an "open primary" means something significantly different than what is proposed by the Initiative, Petitioners still maintain that the term "open primary" is accurate because other states have used it to describe similar primary election systems that have either been adopted or proposed in those states. While other states may have used the term, we conclude that it is not distinctive in Idaho given Idaho's history. Use of "open primary" in this state would not be distinctive because it does not accurately distinguish the new voting system the Initiative proposes from Idaho's previous open primary system.

### iii. The term "nonparty blanket primary" is prejudicial.

Petitioners also argue that the term "nonparty blanket primary" is misleading and prejudicial because it is not what the Initiative proposes, it is not how the National Conference of State Legislatures ("NCSL") refers to similar primaries, and, in fact, the NCSL describes a blanket primary as a system found unconstitutional by the United States Supreme Court. The Attorney General argues that the term "nonparty blanket primary" is not misleading because the United States Supreme Court has used similar terminology to describe the type of primary system proposed by the Initiative.

As previously mentioned, in *Jones*, the United States Supreme Court invalidated California's "partisan blanket primary" system as unconstitutional. 530 U.S. 567. The Supreme Court held that a partisan blanket primary unconstitutionally impedes a political party's First Amendment right of association because it permits nonparty members to select the party's nominees. *Id.* at 586. Eight years later, the Supreme Court upheld Washington's "nonpartisan blanket primary" system against a constitutional challenge because voters did not decide the political party's nominees, but instead just selected the top two candidates who would advance to the general election. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 453–54 (2008).

We conclude that, although "nonparty blanket primary" is not commonly used to describe the measure, to the extent some individuals are familiar with the term, it is likely to cause prejudice against the Initiative. The short title risks confusing voters about the constitutionality of the proposed primary system. The Supreme Court held that a "partisan blanket primary" is unconstitutional, but a "nonpartisan blanket primary" is constitutional. It has never discussed a

19

"nonparty blanket primary." Using an undefined term that is very similar to, but slightly different from those discussed by the Supreme Court could cause a voter to conclude that the system proposed in the Initiative has been or would be held to be unconstitutional, when in fact it has not.

Petitioners argue that "open primary" accurately describes the Initiative's primary system; therefore, not using "open primary" as part of the short title prejudices the Initiative. For the reasons already discussed above, Petitioners' argument on this point is unpersuasive.

Therefore, we conclude that the terms "nonparty blanket primary," blanket primary," and "open primary" each fail to accurately describe the primary system proposed by the Initiative. It appears the most accurate description for the type of primary proposed in the Initiative is a "top four primary." This is the term used in the amended Initiative Petition to describe the system. Additionally, the NCLS refers to a similar system that advances two nominees instead of four as a "top two primary." *See State Primary Election Types*, Nat'l Conf. of State Legislatures (Jun. 22, 2023), https://www.ncsl.org/elections-and-campaigns/state-primary-election-types.

iv. <u>The term "ranked choice voting" is distinctive, but the short title stating the Initiative would "require ranked choice voting" is prejudicial.</u>

Petitioners next take issue with two related aspects of the short title that concern the proposed changes to the tabulation of votes at the general election. First, they argue that "ranked choice voting" is not distinctive because "instant runoff voting" more accurately describes the Initiative's proposed tabulation system. Petitioners separately argue that the short title prejudices the Initiative because it inaccurately states that the Initiative would "require ranked-choice voting for general elections."

The Attorney General argues "ranked choice" and "instant runoff" are interchangeable terms and, therefore, the term "ranked choice voting" is distinctive and accurately describes the vote tabulation method described in the Initiative. The Attorney General also argues that the only reasonable reading of the short title is that it states the Initiative requires a ranked choice voting *system*, not that it requires voters to rank all candidates on a ballot.

Again, we must compare existing Idaho election law to what the Initiative proposes in order to determine whether the term "ranked choice voting" is distinctive. Under current law, the general election ballot contains political party nominees for each office. I.C. § 34-906. The candidate who receives the most votes for each office is elected. I.C. § 34-1215.

The Initiative would replace the existing system with what it calls "instant runoff voting" for those public offices that require a top four primary. The instant runoff voting proposed in the

Initiative would tabulate ballots in "rounds." "In a round of tabulation, each ballot counts as a vote for its highest-ranked active candidate" for an elective office. After the highest-ranking votes for an office are tabulated within a round, the candidate receiving the fewest number of votes is eliminated. In subsequent rounds, a vote for eliminated candidates would be transferred to the ballot's next-highest ranking candidate. When two candidates remain, whichever candidate receives a majority of the highest-ranking votes is declared the winner.

We conclude that the record demonstrates that the terms "ranked choice" and "instant runoff" are used interchangeably, and Petitioners have not established that the term "ranked choice voting" fails to accurately acquaint a voter with what she is sponsoring. Petitioners concede that ranked choice voting describes the Initiative's proposed voting system. Petitioners also use ranked choice voting to describe the Initiative on their own website. *See Open Primaries Initiative: How it Works*, Idahoans for Open Primaries, https://openprimariesid.org/open-primaries-initiative (last visited Aug. 10, 2023). Other sources confirm that the terms are used interchangeably. *E.g.*, *Ranked Choice Voting*, FairVote, https://fairvote.org/our-reforms/ranked-choice-voting/ (last visited Aug. 10, 2023) ("Ranked choice voting (RCV) — also known as instant runoff voting[.]"); T. Quinn Yeargain, *Democratizing Gubernatorial Selection*, 14 Ne. U.L. Rev. 1, 40 (2022) ("More states could set up ranked-choice (or instant-runoff) voting[.]"). Finally, the Idaho Legislature defined the terms interchangeably when it prohibited the practice. *See* I.C. § 34-903B(2)(b).

Despite essentially conceding that "ranked choice voting" accurately describes the Initiative, Petitioners argue the term is not distinctive because it is an umbrella term that encompasses several methods of vote tabulation. Petitioners contend that "instant runoff voting" is a type of ranked choice voting and is the more accurate description for what is proposed in the Initiative. Petitioners argue that there are five different variants of ranked choice voting that have been adopted in the United States. However, the only authority Petitioners cite for this proposition does not use the term "instant runoff voting." *See* Jack Santucci, *Variants of Ranked-Choice Voting from a Strategic Perspective*, 9 Pol. & Governance, no. 2, 2021, at 344, available at: https://www.cogitatiopress.com/politicsandgovernance/article/view/3955/3955 ("This article describes five major versions [of ranked choice voting] used . . . for US public elections: alternative vote, single transferable vote, block-preferential voting, the bottoms-up system, and alternative vote with numbered posts."). Petitioners have failed to cite an authority to this Court supporting

their position; therefore, they have failed to persuade us that the term "ranked choice voting" is not distinctive.

Nevertheless, we conclude that the short title's statement that the Initiative would "require ranked choice voting for general elections" is likely to prejudice the Initiative. Petitioners argue this language inaccurately suggests that the Initiative requires voters to rank each candidate. The Attorney General argues that the short title only conveys that the Initiative requires a ranked choice voting *system*.

We are unpersuaded by the Attorney General's argument. For one, the short title does not use the word "system." More importantly, however, the Attorney General's interpretation is belied by similar language in the general title.

The general title states that "ranked-choice voting would require voting for each candidate on the ballot in order of preference." This statement is patently false. The Initiative expressly states, "voters are not required to rank every candidate." As a result, we cannot conclude that the short title's statement that the Initiative will "require ranked choice voting for general elections" is intended to convey a voting system rather than a requirement to rank every candidate on the ballot. At a minimum, the statement is ambiguous; thus, is likely to prejudice the Initiative.

v.    <u>The use of the verbs "replace" and "require" is not likely to prejudice the Initiative.</u>

Petitioners next argue that the Attorney General's short title is prejudicial because the words "replace" and "require" have a negative connotation that suggests the Initiative is limiting voter choice. Petitioners focus on the words "replace" and "require," arguing that these restrictive words prejudice the Initiative. The Attorney General argues that the terms "replace" and "require" are similar to language Petitioners have used to describe the Initiative.

We conclude that use of these two words is not prejudicial because they are consistent with our caselaw requiring that the short title identify how an initiative changes existing law. *See Buchin*, 128 Idaho at 272, 912 P.2d at 640. In *Buchin*, this Court held that a short title was not distinctive because it failed to convey to voters how the initiative would change existing abortion laws. *Id.* at 270–72, 912 P.2d at 638–40. We explained that the short title failed to alert voters to the fact that it sought to both *add to and amend* existing abortion laws. *Id.* at 272, 912 P.2d at 640. As a result, it failed to "distinguish the initiative and accurately acquaint the voter with what he or she is sponsoring." *Id.* at 270–72, 912 P.2d at 638–40.

The Attorney General's use of the words "replace" and "require" are not inherently prejudicial to voters as Petitioners have suggested. Petitioners have cited no authority to support their contention that these words have a "negative restrictive connotation." While we understand that Petitioners would prefer different language, "it is not the Court's role to find another way or the best way to draft a long title[.]" *See Buchin*, 128 Idaho at 270, 912 P.2d at 638.

vi.    Dividing the short title into two numbered clauses does not render it argumentative.

Idaho Code section 34-1809(2)(e) states that "the attorney general shall, to the best of his ability, give a true and impartial statement of the purpose of the measure and in such language that the ballot title shall not be intentionally an argument . . . for or against the measure."

Petitioners' final challenge to the short title is that it is inappropriately divided into two numbered sections and therefore is an argument against the Initiative. Petitioners argue that the Attorney General divided the short title into two numbered clauses to support his position that the short title violates the single-subject rule;[1] therefore, it is essentially aiding his argument against the Initiative. The Attorney General maintains that the short title's two-part structure is not an argument against the Initiative, but instead is required to make the title distinctive and convey to voters that the Initiative implements two major changes.

We hold that the short title is not an argument against the Initiative simply because it has been divided into two numbered sections. As discussed above, the Initiative would change two major aspects of Idaho's election system: the primary election system and the general election vote tabulation system. Petitioners appear to agree that the Initiative proposes two changes because they divide their proposed short title into two clauses: "An initiative to allow all Idaho voters the right to participate in open primary elections *and* to establish an instant runoff general election." (emphasis added). Therefore, Petitioners' point of disagreement appears to be the short title's use of the numbers rather than its use of two clauses. We cannot conclude that the use of numbers renders the short title argumentative.

In sum, we hold that the short title fails to substantially comply with section 34-1809(d) and (e) in several respects. Its use of the term "nonparty blanket primary" fails to utilize language by which the measure is commonly referred to, is not distinctive, and is likely to prejudice the

---

[1] Idaho Code section 34-1801A(1) requires that "an initiative petition shall embrace only one (1) subject and matters properly connected with it."

23

Initiative. Additionally, the statement that the Initiative would "require ranked choice voting for general elections" is also likely to prejudice the Initiative.

    c.  <u>The general title does not substantially comply with section 34-1809.</u>

In addition to the short title, Idaho law requires the Attorney General to provide a "general title" not exceeding 200 words for the proposed initiative. I.C. § 34-1809(2)(d)(ii). As we have previously noted, Idaho law further provides that:

> In making the ballot title, the attorney general shall, to the best of his ability, give a true and impartial statement of the purpose of the measure and in such language that the ballot title shall not be intentionally an argument or likely to create prejudice either for or against the measure.

I.C. § 34-1809(2)(e). "[I]t is not the Court's role to find another way or the best way to draft a [general] title, but rather to examine the Attorney General's language and ask whether it expresses the 'purpose of the measure' without being argumentative or prejudicial." *Buchin*, 128 Idaho at 270, 912 P.2d at 638. However, unlike the short title, the general title is not required to be distinctive or to use language by which the measure is commonly referred to or spoken of.

In this case, the Attorney General's general title for the Initiative states:

> This measure proposes two distinct changes to elections for most public offices.

> First, this measure would abolish Idaho's party primaries. Under current law, political parties nominate candidates through primary elections in which party members vote for a candidate to represent the party in the general election. The initiative would create a system where all candidates participate in a nonparty blanket primary and all voters vote on all candidates. The top four vote-earners for each office would advance to the general election. Candidates could list any affiliation on the ballot, but would not represent political parties, and need not be associated with the party they name.

> Second, the measure would require ranked-choice voting for the general election. Under current law, voters may select one candidate for each office, and the candidate with the most votes wins. Instead, ranked-choice voting would require voting for each candidate on the ballot in order of preference. The votes would be counted in successive rounds for each order of preference. The candidate with the fewest votes in each round would be eliminated, and votes for that candidate in later rounds would not be counted. The candidate with the most votes in the final round would win.

Petitioners assert that the general title is prejudicial in six ways: (1) it is artificially divided into two numbered paragraphs, (2) it also uses the misleading term "nonparty blanket primary," (3) it incorrectly states voters must rank all the candidates, (4) it suggests ranking candidates can lead to multiple votes, (5) it suggests votes cast for an eliminated candidate will not be counted,

24

and (6) it incorrectly states candidates may list any party affiliation on the ballot regardless of whether the candidate is affiliated with that party.

The Attorney General asserts that Petitioners largely repeat their arguments concerning the short title, and in response, he reincorporates his prior responses to those arguments. He identifies only two new arguments: (1) that the general title creates misconceptions and ambiguities regarding how votes are counted, and (2) that the general title incorrectly states candidates can list any affiliation on the ballot. In response to those arguments, the Attorney General argues that the general title does not suggest ranking candidates can lead to multiple votes or that votes for eliminated candidates will not be counted. The Attorney General also argues that the general title is accurate because the Initiative allows candidates to list any party affiliation without being associated with that party.

We have already addressed several of Petitioners' arguments in relation to the short title. Our above analysis applies with equal force to their arguments concerning the general title. Accordingly, for the reasons expressed above, we conclude that: (1) the general title is not argumentative because it is divided into two numbered paragraphs; (2) the general title is prejudicial due to its use of the term "nonparty blanket primary," and (3) the general title is likely to prejudice the Initiative because it incorrectly states voters must rank all the candidates.

Of Petitioners' remaining arguments, the fourth and fifth raise related concerns and we will address them together. Petitioners' fourth argument is that the general title is inaccurate and prejudicial because it introduces a misconception that the Initiative requires voters to cast multiple votes in a single election. Petitioners' fifth argument is that the general title implies that votes cast for eliminated candidates will not be counted or is ambiguous about whether the votes will be counted. In essence, Petitioners argue that the general title fails to accurately communicate the Initiative's process for tabulating votes.

The portion of the general title explaining the tabulation process states:

The votes would be counted in successive rounds for each order of preference. The candidate with the fewest votes in each round would be eliminated, and votes for that candidate in later rounds would not be counted. The candidate with the most votes in the final round would win.

We agree that the general title's description of the tabulation process is likely to prejudice the Initiative because it fails to accurately explain a key feature of ranked choice voting: that a vote for an eliminated candidate will be transferred to the voter's next-highest ranked active candidate.

The challenged language communicates that: (1) votes are counted in successive rounds in order of preference; (2) the candidate with the fewest votes in a round is eliminated; and (3) votes for the eliminated candidate would not be counted in later rounds. However, the general title fails to explain that, in the next round, the ballot would be counted as a vote for the next highest ranked candidate. Nothing in the general title advises the voter that her ballot would continue to be counted in each successive round so long as one of her ranked candidates remained. The failure to include this information is a failure to accurately explain the purpose of the measure to voters and how it functions. Therefore, we conclude that it is likely to prejudice the Initiative.

We are unpersuaded by Petitioners' remaining argument that the general title's description of the tabulation process inaccurately implies voters are required to cast multiple votes in a single election. Petitioners do not identify specific language in the general title as inaccurate or prejudicial in this regard so it is unclear what language they take issue with, which in turn renders us unable to review their contention.

Finally, Petitioners' sixth argument is that the general title's statement that "[c]andidates could list any affiliation on the ballot, but would not represent political parties, and need not be associated with the party they name" is incorrect. Petitioners claim this statement is contradicted by Section 22 of the Initiative, which states that:

> After each candidate's name, the ballot shall include the candidate's indicated party affiliation, if any, and the ballot shall contain a disclaimer informing the voter that a candidate's designated affiliation does not imply that the candidate is nominated or endorsed by the political party or group or that the party or group approves of or associates with that candidate, but only that the candidate is registered as affiliated with the political party or political group.

The Attorney General argues that the statement is correct because the Initiative does not require candidates to associate with a party before identifying a party affiliation on their declaration of candidacy.

Section 22 of the Initiative does not support Petitioners' argument. Section 22 requires only that the ballot *contain a disclaimer* informing the voter that a candidate's designated affiliation only implies that the candidate is registered as affiliated with the political party. Requiring a disclaimer on the ballot is not the same as requiring the candidate to associate with a political party prior to identifying that party on the ballot. Thus, Section 22 does not establish that the challenged statement is false. We hold that this statement in the general title substantially complies with section 34-1809.

26

In summary, we hold that the general title fails to substantially comply with section 34-1809(d) and (e) because it is likely to prejudice the Initiative due to: (1) its use of the term "nonparty blanket primary," (2) it falsely stating that voters would be required to vote for each candidate on the ballot in order of preference, and (3) its failure to advise the voter that her ballot would continue to be counted in each successive round so long as one of her ranked candidates remains.

Having concluded that the Attorney General's short and general ballot titles fail to substantially comply with the statute, we now turn to the appropriate remedy.

d. <u>We will retain jurisdiction of this matter, and order the Attorney General to provide new ballot titles to this Court for review.</u>

Petitioners argue that if the Court agrees that the Attorney General's short and general ballot titles are deficient, the Court has the authority under Idaho Code section 34-1809(3)(c) to certify new ballot titles directly to the Secretary of State. Petitioners maintain that the Attorney General has already been given one opportunity to provide sufficient ballot titles but has failed to do so. Petitioners emphasize that, given his and the Solicitor General's public opposition to the Initiative, there is a substantial risk that he will again provide insufficient ballot titles to further delay Petitioners' ability to gather signatures for the Initiative. Petitioners argue that they are running out of time to collect signatures to qualify the Initiative for the ballot and they cannot risk further delay if the next ballot titles also fail to substantially comply with the statute. To this end, Petitioners have submitted proposed short and general ballot titles, which they ask us to certify directly to the Secretary of State pursuant to Idaho Code section 34-1809(3)(c). In the alternative, Petitioners ask the Court to retain jurisdiction of this matter and direct the Attorney General to immediately provide new ballot titles for the Court's review.

Idaho Code section 34-1809(3)(c) provides that:

> The supreme court shall thereupon examine said measure, hear argument, and in its decision thereon certify to the secretary of state a ballot title and a short title for the measure in accord with the intent of this section. The secretary of state shall print on the official ballot the title thus certified to him.

In enacting this section, it appears the Legislature recognized the potentially disastrous consequences that a delayed ballot title certification process could have on Idahoan's constitutional right to enact their own legislation through the initiative process. Section 34-1809(3)(c), by its plain language, promotes the public policy goal of providing sufficient ballot titles by alternative means if the default process comes up short.

27

However, in *AFL,* we stated that the portion of the statute that suggests the Court can draft ballot titles and certify them to the Secretary of State was "incorrect, [and] beyond our power under the writ of certiorari or review." *AFL*, 75 Idaho at 374, 272 P.2d at 711. Accordingly, we held that a review upon a writ of certiorari is to "declare the law on the subject, and point out to them the legal scope within which their judgment and discretion must be exercised." *Id.* at 372, 272 P.2d at 710 (emphasis omitted) (quoting *Balderston v. Brady*, 17 Idaho 567, 575, 107 P. 493, 495 (1910)). We concluded in *AFL* that the extent of our authority was "to declare the legal requirements and standards by which the short title is to be constructed and to determine whether or not the title as submitted by the Attorney General complies therewith." *Id.* at 374, 272 P.2d at 711.

Here, Petitioners have presented compelling evidence of the harm already suffered due to the delay in certifying ballot titles for the Initiative. Petitioners contend that the summer season is the most opportune time for collecting signatures for ballot measures. They allege that large scale community events, like those occurring around the Fourth of July, allow proponents of ballot measures to engage with large numbers of Idaho voters in a short span of time. Petitioners state they had to cancel kick-off events in thirty Idaho communities across the state due to the delay caused by the deficient titles. Even if ballot titles are immediately certified and they can begin collecting signatures, Petitioners claim that they still may not have enough time to collect the necessary signatures by the statutory deadline. They also raise legitimate concerns related to the Attorney General's tweet about the need to "defeat" the Initiative, and the Solicitor General's statement that state attorney generals "are the strongest line of defense" against "this failed idea."

Despite these concerns, we believe that it is possible to act within the bounds of our jurisdiction expressed in *AFL* while still providing swift relief to the Petitioners. Therefore, we decline to certify Petitioners' proposed titles directly to the Secretary of State. However, we will retain jurisdiction of this matter and order the Attorney General to provide new short and general ballot titles to this Court by 4 p.m. MDT on Friday, August 11, 2023, which are consistent with the views expressed in this decision and comply with Idaho law. We will then review the ballot titles to determine whether they are substantially compliant with the statute. No briefing or oral argument will be granted concerning the new ballot titles.

We must not lose sight of the reality that this case implicates the people's fundamental right of direct legislation, which they reserved to themselves in Article III, section 1 of the Idaho Constitution. Given the constitutional rights at stake, we will retain jurisdiction as Petitioners

request to ensure a timely resolution in this matter. If the Attorney General's new ballot titles are not substantially compliant with the statutory requirements, we will reevaluate whether due process requires that we prepare the ballot titles and certify them directly to the Secretary of State in order to prevent a violation of Petitioners' fundamental right of direct legislation under the Idaho Constitution.

**D. Petitioners have failed to establish a right to a writ of mandamus extending the timeline for obtaining the required signatures.**

Petitioners also ask the Court to issue a writ of mandamus compelling the Secretary of State to extend the statutory deadline for them to obtain signatures. In support of this argument, Petitioners cite to this Court's broad discretion to provide equitable relief, arguing that the Court's equitable powers permit to it extend the statutorily mandated deadline to remedy the delay caused by the deficient ballot titles.

The Attorney General argues that the Petitioners cannot obtain a writ of mandamus because the Secretary of State does not have a clear legal duty to accept signatures beyond the statutory deadline. The Attorney General also argues that Petitioners do not have a clear right to obtain signatures beyond the deadline.

A writ of mandamus "may be issued by the supreme court . . . to compel the performance of an act which the law especially enjoins as a duty resulting from an office, trust or station[.]" I.C. § 7-302. "[T]his Court has repeatedly held that mandamus is not a writ of right and the allowance or refusal to issue a writ of mandate is discretionary." *Regan v. Denney*, 165 Idaho 15, 20, 437 P.3d 15, 20 (2019) (quoting *Coeur d'Alene Tribe*, 161 Idaho at 512, 387 P.3d at 765). A writ of mandamus "will lie if the officer against whom the writ is brought has a 'clear legal duty' to perform the desired act, and if the act sought to be compelled is ministerial or executive in nature." *Coeur d'Alene Tribe*, 161 Idaho at 512, 387 P.3d at 765 (quoting *Utah Power & Light Co. v. Campbell*, 108 Idaho 950, 953, 703 P.2d 714, 717 (1985)). "If the act sought to be compelled of the public officer is ministerial, the Court must find the party seeking the writ has a clear legal right to have the act performed." *Id.* (citing *Kolp v. Bd. of Trs. of Butte Cnty. Joint Sch. Dist. No. 111*, 102 Idaho 320, 322–23, 629 P.2d 1153, 1155–56 (1981)).

Petitioners have not established that the Secretary of State has a "clear legal duty" to extend the deadline to obtain signatures. Idaho Code section 34-1802(1) establishes a statutory deadline for collecting signatures for an initiative: "The last day for circulating petitions and obtaining signatures shall be the last day of April in the year an election on the initiative will be held." While

29

the statutes provide a method for challenging the ballot titles, it did not provide an extension of time in the event of a successful challenge. Petitioners have thus failed to establish that the necessary conditions exist for the issuance of a writ of mandamus. Thus, we decline Petitioners' request for mandamus relief.

**E. Petitioners are awarded their reasonable attorney fees.**

Both parties argue they are entitled to attorney fees pursuant to Idaho Code sections 12-117(1) and 12-121. "Idaho Code section 12-117 is the exclusive basis for awarding attorney's fees in a matter with a person and a governmental entity as adverse parties." *Citizens Against Linscott/Interstate Asphalt Plant*, 168 Idaho at 721, 486 P.3d at 531 (citing *City of Osburn v. Randel*, 152 Idaho 906, 909, 277 P.3d 353, 356 (2012)). Section 12-117(1) "allows for an award of attorney fees to the prevailing party in a proceeding where a governmental entity and a person are adverse parties and the nonprevailing party 'acted without a reasonable basis in fact or law.'" *S Bar Ranch v. Elmore County*, 170 Idaho 282, 313, 510 P.3d 635, 666 (2022), *as amended* (Jun. 14, 2022) (quoting I.C. § 12-117(1)). "This Court has stated that, in considering all of the claims involved in an action, a court examines the prevailing party question 'from an overall view, not a claim-by-claim analysis.'" *State, Dep't of Transp. v. Grathol*, 158 Idaho 38, 53, 343 P.3d 480, 495 (2015) (citation omitted).

We hold that Petitioners are the overall prevailing party in this action. Petitioners have demonstrated that both the short and general ballot titles are deficient in multiple respects. While Petitioners have not succeeded in obtaining mandamus relief, they have prevailed from the overall perspective of this action.

"The standard for evaluating whether a party's conduct was 'without a reasonable basis in fact or law' under section 12-117 is substantially similar to the standard for evaluating whether a party pursued an action 'frivolously, unreasonably, or without foundation' under section 12-121." *S Bar Ranch*, 170 Idaho at 313, 510 P.3d at 666 (citation omitted). We conclude that the Attorney General acted without a reasonable basis in law in this matter. The Attorney General's short and general ballot titles contained a blatant misstatement concerning what the Initiative would require. The general title failed to fully and accurately explain how the ranked choice voting method would work. Finally, both ballot titles instead contain the never-before used term "nonparty blanket primary." Accordingly, we conclude that Petitioners are entitled to their reasonable attorney fees pursuant to section 12-117(1).

# IV.   CONCLUSION

Petitioners' request for a writ of certiorari to review the Attorney General's ballot titles is granted. We hold that the short and general ballot titles fail to substantially comply with Idaho Code section 34-1809. We will retain jurisdiction of this matter and order the Attorney General to, by **4 p.m. MDT on Friday, August 11, 2023**, provide new short and general ballot titles that comply with Idaho law and are consistent with the opinions expressed in this decision. Petitioners' request for a writ of mandamus is denied. Petitioners are awarded their reasonable attorney fees.

Chief Justice BEVAN, and Justices BRODY, STEGNER, and MOELLER CONCUR.

## ON THE ATTORNEY GENERAL'S SUBMISSION OF REVISED BALLOT TITLES

ZAHN, Justice.

The Attorney General timely submitted revised short and general ballot titles in accordance with this Court's August 10, 2023 opinion and order.

The revised short ballot title states:

Measure to (1) replace voter selection of party nominees with a top-four primary; (2) require a ranked-choice voting system for general elections.

The revised general ballot title states:

This measure proposes two distinct changes to elections for most public offices.

First, this measure would abolish Idaho's party primaries. Under current law, political parties nominate candidates through primary elections in which party members vote for a candidate to represent the party in the general election. The initiative creates a system where all candidates participate in a top-four primary and voters may vote on all candidates. The top four vote-earners for each office would advance to the general election. Candidates could list any affiliation on the ballot, but would not represent political parties, and need not be associated with the party they name.

Second, the measure would require a ranked-choice voting system for the general election. Under current law, voters may select one candidate for each office, and the candidate with the most votes wins. Under the ranked-choice voting system, voters rank candidates on the ballot in order of preference, but need not rank every candidate. The votes are counted in successive rounds, and the candidate receiving the fewest votes in each round is eliminated. A vote for an eliminated candidate will transfer to the voter's next-highest-ranked active candidate. The candidate with the most votes in the final round wins.

Having reviewed the revised short and general ballot titles, we conclude that they are consistent with the views expressed in our prior opinion dated August 10, 2023, and that they also

substantially comply with the requirements of Idaho Code section 34-1809(2)(d) and (e). We therefore certify the revised short and general ballot titles to the Idaho Secretary of State.

Chief Justice BEVAN, and Justices BRODY and MOELLER CONCUR.


Justice STEGNER, DISSENTING.

I respectfully dissent from the majority's opinion because I do not agree that the Attorney General's updated titles (which were received by the Court at 2:19 p.m. MDT on August 11, 2023) substantially comply with the statutory initiative process. After we released our earlier opinion, at this Court's order, the Attorney General submitted new language for the Short and General Ballot Titles. Today, the majority holds that the amended language substantially complies with Idaho Code section 34-1809 despite the presence of what I perceive as multiple flaws in the amended language.

As described in our previous opinion, we review ballot initiatives for "substantial compliance" with the relevant statutory provision. The majority's analysis of "substantial compliance" rests on an interpretation of the relevant law. Idaho Code section 34-1809 states in part:

(d) The ballot title shall contain:

(i) Distinctive short title not exceeding twenty (20) words by which the measure is commonly referred to or spoken of and which shall be printed in the foot margin of each signature sheet of the petition.

. . . .

(e) In making the ballot title, the attorney general shall, to the best of his ability, give a true and impartial statement of the purpose of the measure and in such language that the ballot title shall not be intentionally an argument or likely to create prejudice either for or against the measure.

I.C. § 34-1809(2)(d)(i), (2)(e).

To begin, the Attorney General's revised Short Title suggests the implementation of the following language: "Measure to (1) replace voter selection of party nominees with a top-four primary; (2) require a ranked-choice voting system for general elections." This language has at least two problems. The first clause suggests that party nominees are currently selected by party members in a primary election. While that is true for one political party (Republican), it does not describe the reality for the other major political party (Democrat). The second clause implies that

32

voters will be required to participate in ranked choice general election, when in fact a voter would be entitled to cast a vote for a single individual. In my view, these misimpressions alone give me pause. However, significant additional problems remain.

Idaho Code section 34-1809(2)(e) requires the Attorney General to "give a true and impartial statement of the purpose of the measure[.]" The General Ballot Title is neither true nor impartial. One of the first statements in the General Ballot Title is the statement that "[t]he measure would abolish Idaho's party primaries." "Abolish" is defined as "to completely do away with (something)[.]" *Abolish*, Merriam-Webster, https://www.merriam-webster.com/dictionary /abolish (last visited Aug. 15, 2023). A top four primary election that continues the identification of candidates by political party would not "abolish" party primaries in Idaho. To say that the initiative "abolish[es] Idaho's party primaries" is both inaccurate and prejudicial to the initiative's proponents.

The next problem with the Attorney General's General Ballot Title is that it fails to inform Idaho's citizens that, under the initiative, the majority rules. To win an election under the proposed system, a candidate must receive a majority of the votes from Idaho's citizens. If a candidate receives a majority of the votes cast in the first round of voting, that candidate is declared the winner, the election is over, and ranked choice has nothing to do with the election. However, the Attorney General's formulation does not apprise voters of this important facet of the initiative. Instead, voters are left with the erroneous impression that the successive rounds of voting are inevitable. An initiative that promotes the democratic principle of majority rule should be identified as such. Not only does the recognition of majority rule inform our citizens of the type of election in which they are participating, but it also promotes a free and fair election including that principle. I would classify the Attorney General's failure to identify the effects of a candidate receiving the majority of the votes in the first round as a prejudicial omission.

As a result of what I consider Short and General Ballot Titles that do not substantially comply with Idaho's statutes, I have drafted titles that I think illustrate the shortcomings of the Attorney General's proposed titles. A red-lined version showing the changes I suggest be made to the Attorney General's titles and that I suggest are substantially compliant with Idaho's statutes is provided below. A clean copy with the suggested changes to the Short and General Ballot Titles has also been provided below the red-lined version.

**Short Title (20 words)**

Measure to (1) create new primary ~~replace voter~~ selections ~~of party nominees~~ with a top-four primary; (2) implement~~require~~ a ranked-choice voting system for general elections.

**General Title (200 words)**

This measure proposes two ~~distinct~~ changes to elections for most public offices.

~~First, t~~This measure would replace~~abolish~~ Idaho's party primaries. Currently~~Under current law~~, one political part~~y~~ies nominates candidates through primary elections in which party members vote for a candidate to represent that~~e~~ party in the general election. The initiative creates a system where all candidates participate in a top-four primary, and voters ~~may~~ vote for one~~on all~~ candidates per office. The top four vote-earners for each office would advance to the general election. Candidates could list any affiliation on the ballot~~, but would not represent political parties, and need not be associated with the party they name~~.

~~Second, t~~The measure would create~~require~~ a ranked-choice voting system for the general election. Currently~~Under current law~~, voters may select one candidate for each office, and the candidate with the most votes, ~~-~~even a plurality, wins. Under the ranked-choice voting system, voters may~~,~~ rank candidates on the ballot in order of preference, but need only vote for one ~~not rank every candidate~~. If one candidate receives a majority of votes cast in any round that candidate wins, otherwise, ~~T~~the votes are counted in successive rounds, and the candidate receiving the fewest votes in each round is eliminated. A vote for an eliminated candidate will transfer to a~~the~~ voter's next-highest-ranked remaining~~active~~ candidate. Rounds continue until one candidate receives a majority of the votes. ~~The candidate with the most votes in the final round wins.~~

**INITIATIVE PETITION 23-86137 — BALLOT TITLES**

**Short Title (20 words)**

Measure to (1) create new primary elections with a top-four primary; (2) implement a ranked-choice voting system for general elections.

**General Title (200 words)**

This measure proposes two changes to elections for most public offices.

This measure would replace Idaho's party primaries. Currently, one political party nominates candidates through primary elections in which party members vote for a candidate to represent that party in the general election. The initiative creates a system where all candidates participate in a top-four primary, and voters vote for one candidate per office. The top four vote-earners for each office would advance to the general election. Candidates could list any affiliation on the ballot.

The measure would create a ranked-choice voting system for the general election. Currently, voters may select one candidate for each office, and the candidate with the most votes, even a plurality, wins. Under the ranked-choice voting system, voters may rank candidates on the ballot in order of preference, but need only vote for one. If one candidate receives a majority of votes cast in any round that candidate wins, otherwise, the votes are counted in successive rounds, and the candidate receiving the fewest votes in each round is eliminated. A vote for an eliminated candidate will transfer to a voter's next-highest-ranked remaining candidate. Rounds continue until one candidate receives a majority of the votes.

For the foregoing reasons, I respectfully dissent from the majority's conclusion that the Attorney General's proposed ballot titles "substantially comply" with Idaho's statutes governing the initiative process.